# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

CASSANDRA MICHELLE LORANCE,       )
                                  )
       Plaintiff,             )
                                  )
vs.                               )    Civil Action No. CV-96-B-1521-NE
                                  )
DAIKIN AMERICA, INC.;             )
DAVID NAITO; and, FORREST         )
KEITH,                            )
                                  )
       Defendants.            )

**ENTERED**

**JUN 18 1997**

## MEMORANDUM OPINION

This action is before the court on defendants' motion for summary judgment.

Plaintiff originally alleged she was discriminated against in violation of: the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq. ("ADA"); Title VII of the Civil Rights Act of 1964, as amended both by the Pregnancy Discrimination Act of 1978 and the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e et seq. ("Title VII" or "PDA"); and, the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 et seq. and 5 U.S.C. §§ 6381 et seq. ("FMLA"). Plaintiff also pled pendent state law claims for fraud and intentional infliction of emotional distress.

In plaintiff's response to defendants' motion, however, Mrs. Lorance concedes that she "does not contest summary judgment on the following claims or issues": (1) FMLA claims against all defendants; (2) ADA claims against the individual defendants, David Naito and Forrest Keith; (3) Title VII claims against defendants Naito and Keith; (4) state law claim of fraud against all defendants; and (5) state law claim for intentional infliction of

emotional distress against David Naito. (Memorandum Brief in
Opposition to Defendants' Motion for Summary Judgment, at i.)

The following claims therefore remain in contention, to be
tested by defendants' motion for summary judgment: (1) ADA claim
against Daikin; (2) Title VII/PDA claim against Daikin; and (3)
state law claim for intentional infliction of emotional distress
against Forrest Keith and Daikin.

Upon consideration of the motion, pleadings, briefs, and
evidentiary submissions, the court concludes that defendants'
motion is due to be granted and all claims dismissed.

### I. SUMMARY OF UNDISPUTED FACTS

Defendant, Daikin America, Inc., ("Daikin") is a corporation
headquartered in Orangeburgh, New York. It operates a facility in
Decatur, Alabama, that manufactures polymer molding powders for
industrial applications. Defendant David Naito is Chairman of the
corporation. (Naito Affidavit, at ¶ 3.) Defendant Forrest Keith is
Daikin's Manager of Human Resources and General Affairs. His
office is in the Decatur plant. (Keith Affidavit, at ¶ 3.)

On August 2, 1993, plaintiff, Cassandra Michelle Lorance,
applied for employment at Daikin's Decatur plant. After completing
pre-employment training, she was hired as a "P-1 Finishing
Operator." (Id., ¶ 10.) Finishing operators generally work on the
production line, cleaning and inspecting drums and bags used for
packaging molding powders. Such employees also: perform scheduled
maintenance, inspection, cleaning, and repairing of process
equipment; monitor equipment data; and, perform quality control

2

tests.[1] (Murray Deposition, at 20-34.)   Plaintiff's immediate supervisor was Gerald Murray (Keith Deposition, at 51), and her production department manager was James Conheady. (Plaintiff's Deposition, at 56.)

Plaintiff worked a standard, 12 hour "rotating shift," which means that she alternated between day and night shift work. (Keith Affidavit, at ¶ 10.)   Although it is not entirely clear whether plaintiff expressed dissatisfaction about the impact of "rotating shift" work on her home life before becoming pregnant with her second child,[2] she clearly did so afterwards.

> Q.   What difficulties had you had with the rotating shift in the past?

---

[1]Daikin's Pl Finishing Operator job description lists the essential duties and responsibilities for that position as follows: clean and inspect drums and bags used for the packaging of molding powders; understand and operate all process steps controlled and monitored by the DCS; performs scheduled maintenance, inspection and cleaning of all process equipment; may generate or handle hazardous waste; troubleshoot equipment and process problems and correct when possible; read and comprehend process instrumentation diagrams; enter process data onto log sheets and in the computer database; perform quality control tests such as apparent density, speed calculations, etc.; maintain cleanliness standards in cleanrooms and all areas of the Finishing building; assist in the development and writing of equipment and process operating procedures; maintain safety, quality and production standards by monitoring key process variables and process indicators; notify supervisor, shift supervisor, and/or team leader of major problems; actively participate and contribute to team and shift change meetings; and, other duties as assigned.

[2]Defendants asserted that the following were "undisputed facts": (1) "[s]hortly after she was hired, Lorance voiced her displeasure with working the rotating shift, but her displeasure had nothing to do with any health problems" (Defendants' submission in support of motion for summary judgment ¶ 11, at F-3(emphasis supplied)); and (2) "Lorance informed Forrest Keith that she was unhappy working the 12 hour rotating shift before she became pregnant with her second child" (id. ¶ 12, at F.-4 (emphasis in original)).

Curiously, plaintiff disputed the first statement (see her brief in opposition to motion for summary judgment ¶ 11, at iii), but admitted the second assertion (id., ¶¶ 12-13 at v).   Hence, this court's textual statement, "[a]lthough it is not entirely clear ... [etc.]."

3

> A.  Well, it is very difficult to work a twelve-hour
>     rotating shift, I feel like it is for anybody.  And
>     I had a small child and then I became pregnant and
>     had another child, but, you know, I had managed to
>     do so and do my job well and that didn't mean that
>     -- just because I was necessarily unhappy with it
>     didn't mean that I was quitting, and I wouldn't
>     have quit.
>
> Q.  Okay.  Had you indicated to someone at Daikin that
>     you didn't care for the rotating shift or that it
>     was a hardship for you?
>
> A.  Forrest [Keith] and I had talked about it, yes.  I
>     had showed interest in pursuing a different
>     position, yes.

(Plaintiff's Deposition, at 65-66.)

Plaintiff became pregnant with her second child in April of 1994: approximately nine months after beginning her employment with Daikin.   Daikin thereafter received several letters from her obstetrician, William Manifold, M.D.  The first was dated May 20, 1994, and read:

> Michelle Lorance is an obstetric patient of this practice
> with an estimated due date of January 14, 1995.  We are
> recommending at this time that she work no more than
> eight hours per day and forty hours per week.  Her
> lifting should be restricted to no more than 25 to 30
> pounds.

(Plaintiff's Supplemental Evidentiary Submission: Exhibit 16.)[3]   In response to that letter, plaintiff's department manager, James Conheady drafted a memorandum to her supervisor, Gerald Murray, stating "[p]er our discussion on 5/23/94, Michelle Lorance should report for work on Tuesday evening at 7:15 pm and work Tuesday

---

[3]Nota bene that plaintiff testified she did not begin to experience complications with her second pregnancy until the Fall of 1994 (Plaintiff's Deposition, at 46, 71); however, as shown above, the first letter from her obstetrician is dated May 20, 1994.

4

night through Saturday night.  Per her doctor's recommendation we
would like to have her work an 8 (eight) hour shift."   (*Id.*:
Exhibit 17.)    At some point, plaintiff personally requested
transfer to a clerical position entailing eight hour, day shift
work (*id.*, 67).[4]

Even so, plaintiff's schedule was not changed by her
supervisor until a second letter from Dr. Manifold.[5]  That letter,
dated July 25, 1994, said:

> In addition to the weight limitations mentioned in our
> last letter, I am advising that Michelle not work a
> rotating shift, not be required to work more than eight
> hours a day or forty hours a week.  If there are no
> duties with these limitations, or not a more sedentary
> job, you may want to place her on medical leave at your
> discretion.   The health of the patient is our main
> concern at this time.

(Movant's Evidence Submitted in Response to Exhibit C of the
Court's Order: Exhibit C to Keith Affidavit.)    Daikin then
accommodated plaintiff by allowing her to work eight hour shifts,
and providing her temporary duties consisting primarily of clerical

---

[4]In the second sentence of paragraph 12 of defendants' submission in
support of the motion for summary judgment, the following is asserted as an
"undisputed fact": "Before Lorance's second pregnancy, she had informed Daikin
that she would prefer a `clerical position' that would allow her to work an eight
hour shift on days only, instead of the twelve hour rotating shift" (emphasis
supplied).  Plaintiff's response says that statement is "Undisputed." Curiously,
however, her response to the contentions of paragraph 11 of defendants'
submission denies that she complained of "rotating shift" work "before she became
pregnant" (emphasis in original). See the parallel discussion in note 2, *supra*.

[5]Defendants assert that plaintiff was not transferred to a clerical
position, because she had not completed Daikin's pre-employment training program
for such positions, and, because no clerical positions then were available.  Both
assertions are disputed by plaintiff; see, e.g., plaintiff's brief in opposition,
at v: "There were eighteen (18) temporary employees hired to perform clerical
functions since January 27, 1994, fourteen of which were during and after her
second pregnancy."

5

tasks. (Keith Affidavit, at ¶ 11.)  She performed the clerical tasks until September 28, 1994 (id., ¶ 12), when Daikin received a letter from John Shannon, M.D.,[6] stating "[Cassandra Lorance] is not to return to work until after her next appointment on 10-17-94 for re-evaluation."  (Movant's Evidence Submitted in Response to Exhibit C of the Court's Order: Exhibit 5 to Plaintiff's Deposition.)

On September 28, 1994, plaintiff was placed on paid, short-term disability leave.[7] (Keith Affidavit, at ¶ 12.)  Plaintiff never returned to work after September 28, 1994.

On October 7, 1994, plaintiff provided Forrest Keith with a certification from Dr. Shannon that she required leave under the Family and Medical Leave Act. (Id.: Exhibit D.)  Daikin's FMLA benefits run concurrently with short-term and long-term disability leave.[8] (Id., ¶ 13.)

---

[6]Dr. Shannon is an associate of Dr. Manifold, in "Decatur Ob-Gyn Associates, PA."

[7]Pursuant to the terms of Daikin's short term disability policy, plaintiff received 100% of her salary for the first 12 weeks of her disability leave, and 60% of her salary for the remaining 14 weeks of her 26 week leave.  (Keith Affidavit, at ¶ 6.)

[8]Daikin's Employee Handbook provides:

**Disability Plans**
Short-term Disability (STD) and Long-term Disability (LTD) work together with Social Security to provide continuing income if you are unable to work. Weeks taken on STD or LTD for a serious health condition that prevents the performance of the essential functions of the job will be counted against the twelve (12) weeks per year that are available for Family and Medical Leave Act leave.

(Keith Deposition: Exhibit 2, at 11.)

6

On October 17, 1994, Dr. Shannon extended the period plaintiff was not to work until six weeks postpartum (*i.e.*, February 14, 1995), due to problems with her pregnancy. (*Id.*: Exhibits 6 & 8 to Plaintiff's Deposition.)

On January 3, 1995, plaintiff's second child was born. One month later, on February 7, 1995, plaintiff delivered to Forrest Keith a handwritten note from Dr. Manifold stating that she could return to work, provided her duties were limited to an eight hour day and a 40 hour work-week. (Plaintiff's Evidentiary Submission: Exhibit 7.) Plaintiff verbally informed Keith, however, that: she was to undergo surgery (a hysterectomy) for complications resulting from childbirth (*e.g.*, pelvic relaxation syndrome[9]); and, her newborn child was bleeding internally. (*Id.*) Keith documented that conversation in a memorandum dated February 7, 1995, reading as follows:

> Michelle Lorance dropped in today to bring me a note from her doctor (Dr. Manifold). The note restricts her to no more than 8 hours work in a day and to no more than 40 hours in one week. Michelle also told me that the work had to be on fixed shift and on days.
>
> I told Michelle that I didn't think we had any jobs for her under such restricted conditions. And, that when she brought in a doctor's note that released her to work the job we hired her to do, she could return.
>
> She said she would be having surgery for a hysterectomy as soon as the baby was well. The baby is experiencing blood in its stools, and has not improved since birth, 5 weeks ago. She is taking the baby to a

---

[9]Pelvic relaxation, otherwise referred to as "uterine prolapse," is a condition where the pelvic organs, generally the uterus, become dislocated or "descended." That condition is a progressive result of injuries resulting from giving birth. *See* A. DeCherney, M.D. and M. Pernoll, M.D., CURRENT OBSTETRICS AND GYNECOLOGIC DIAGNOSIS AND TREATMENT 840 (8th ed. 1994).

7

specialist in Birmingham later this week.  When the baby
is  well,  then  Dr.  Manifold  will  schedule  the
hysterectomy.

I asked Michelle when she thought she might be able
to return to her regular job without restrictions and she
didn't know.  She said it was up to Dr. Manifold.

I told Michelle that I had heard some of her co-
workers say that she had told them she was going to have
her baby and then schedule the hysterectomy so she could
stay on paid leave with insurance until this was all over
and resign when the money stops.  Michelle said she never
said that, and that her co-workers must have just been
speculating or were misinformed.  Michelle said she loved
her job and DAI, and wants to return to work as soon as
possible.  But, she went on that she has just had so many
personal and health problems that it has been a rough
time for her.  She hopes we can find her a place to work
within the restrictions set by Dr. Manifold.

I told her that we don't have a job for her with
those hours.  I told her that whenever she is finally
released from the doctor without restrictions, she needed
to return to her regular job in P-1 Finishing and work
the 12-hour rotation schedule, or, decide to resign -
because those were her choices.  Also, I told Michelle
that she needs to consider that her working the rotating
shift was creating personal problems even before she had
health problems, because her husband and oldest son did
not like her working this shift.  And, she was asking for
an 8-hour day job even back then.  I told her to consider
these things when deciding whether to return to work or
resign, and seek an employer with an 8-hour per day, 5
day per week job that she and her family would be happier
with.

Again, Michelle said she wants to stay with DAI if
possible, but would consider my advice.

Then, I called Dr. Manifold to get clarification on
the release.  Dr. Manifold would not consider changing
the restrictions, but did agree that the restrictions
will only apply for 30 days.  After March 14, no
restrictions apply to Michelle, and, at that time, she
can work all the 12-hour shifts and overtime required.
Also, Dr. Manifold clarified that the 8-hours/day
restriction does not mean days only.  He said his concern
is that "a woman should not be on her feet working for
more than 8 hours at a time in a 24 hour day so soon
after childbirth."  He also added that "She does not have
to be scheduled for fixed shift or just on days."  He

8

siad [sic] we could put her on her normal schedule -
rotating, nights, whatever - as long as we didn's [sic]
exceed 8 hours in one 24 hour period, or, 40 hours in a
7 day week.   This, of course, is inconsistent with
Michelle's earlier statement that Dr. Manifold intended
for her to only work days and on a fixed shift.   So, in
order to get maximum clarification of intent, I asked Dr.
Manifold to write to me a detailed letter outlining
explicit instructions regarding Michelle's condition and
restrictions so all possible questions will have been
answered.   Dr. Manifold agreed (reluctantly), and said he
would mail the letter to me the next day.   Dr. Manifold
also said it was up to the Company (DAI) whether to bring
Michelle in for restricted duty or not, and that his
involvement dealt only with her personal health.

So, at this point, the doctor's position is clear,
and DAI's position is clear, and Michelle's condition is
'we have to wait and see if the baby gets better before
we know if she will be having a hysterectomy sooner or
later'.   And Michelle is released to work restricted
hours for 30 days beginning February 14, 1995, and
released without restrictions beginning March 14, 1995.

(Movant's Evidence Submitted in Response to Exhibit C of the

Court's Order: Exhibit 4 to Keith Deposition.)

In response to Forrest Keith's telephone request for "a

detailed   letter   outlining   ...   Michelle's   condition   and

restrictions," Dr. Manifold wrote the following:

As per our phone conversation today, Michelle Lorance may
return to work on Tuesday, February 14, 1995.   At that
time she should be limited to an eight hour work day
within a twenty four hour period.   She should be limited
to a five day work week within a seven day period.   She
may return to full activities on March 14, 1995.   Thank
you for your consideration in this matter.

(Movant's Evidence Submitted in Response to Exhibit C of the

Court's Order: Exhibit 8.)

Plaintiff testified that James Conheady and Forrest Keith

informed her that no "light duty" jobs were available, and suggested

she remain on short term disability leave until the hysterectomy

9

was performed, at which time she could "return fully capable."
(Plaintiff's Deposition, at 57-58.)[10]

Plaintiff concurred and remained on short term disability
leave throughout the period encompassing her surgery and post-
operative recovery. (Id., 63-64.) At the end of plaintiff's conva-
lescence, however, Dr. Manifold still did not release her to return
to full work duty as a P-1 Finishing Operator. Instead, he placed
permanent restrictions on the duties she could perform. (Id., 76.)
"[H]e suggested [she] no longer continue to do the strenuous
lifting and bending that [her] job required and to ask for a
transfer or a job of [more] sedentary nature...." (Id.)

When plaintiff informed Daikin of her permanent restrictions,
Forrest Keith requested more information from Dr. Manifold,

---

[10]See also plaintiff's deposition, at 59-60:

Q.   And did I accurately set out what was in the
     conversation or was there something else?

A.   Will you say it again?

Q.   Sure. That at the request of your doctor, you explained
     to [Daikin] that you needed light duty as set forth in
     Exhibit 7, that you were facing a hysterectomy as soon
     as that could be arranged, that you were recovering from
     childbirth, that your son had internal bleeding and that
     that was your situation and they said -- Forrest and
     James said, well, we can't accommodate you in the light
     duty you have asked for, so you should stay on leave and
     we want more -- and you have added we want more
     information from your doctor besides Exhibit 7.

. . . .

Q.   Did I accurately say it that time?

A.   I think so.

10

specifying exactly what tasks plaintiff could, and could not
perform. (*Id.*, 77.) In response, plaintiff presented a letter from
Dr. Manifold dated May 10, 1995, stating "Michelle Lorance, for
health reasons, should have a more sedentary job, with no strenuous
activities in the future." (*Id.*: Exhibit 10.) Daikin again
requested information more specific than that. (Keith Affidavit,
at ¶ 19.) Dr. Manifold complied with a letter dated May 12, 1995,
stating in pertinent part:

> Michelle Lorance has been a patient of mine over the past
> several years. I have delivered both of her children and
> have recently operated on her for pelvic relaxation
> syndrome. I have advised Michelle that she should avoid
> "strenuous activities" that would increase the pressure
> in her pelvic region, since this can lead to recurrent
> problems with pelvic relaxation symptoms. Michelle and
> I have discussed her activities at her present job, and
> I believe that these will lead to ongoing problems with
> pelvic pain. I have advised her, for medical reasons, to
> seek a modification of her work activities to avoid heavy
> lifting and straining. I believe that Michelle can
> function very well in a more sedentary job environment,
> including walking (20%). I have discussed this with
> Michelle and Melody Gill of Managed Care, and I believe
> that Ms. Gill understands the "spirit" of what we hope to
> accomplish with this job modification.

(Movant's Evidence Submitted in Response to Exhibit C of the
Court's Order: Exhibit 11.) Plaintiff presented that letter to
Forrest Keith the same day it was written: May 12, 1995. (*Id.*,
81.) Keith said that such an accommodation might not be feasible,
but James Conheady ultimately would decide the issue. (*Id.*, 82.)

Accordingly, plaintiff presented the letter to James Conheady
later that same day. She testified that he "threw the paper down
on the desk and told me he didn't want to see that shit." (*Id.*,
83.)

11

> He said that he had busted his ass out there just like
> everybody else had and they couldn't stand for people
> like me trying to take advantage of them like this. And
> I started to cry, to apologize, to say that I was sorry
> for circumstances that was out of my control. And he
> told me to save my waterfall of tears and that he had
> probably already said too much and for me to go see
> Forrest Keith.

(*Id.*, 83-84.) Later that same afternoon, plaintiff spoke with
Forrest Keith on the telephone. During the conversation, Keith
asked plaintiff if she was aware of any way that Daikin could
accommodate her. (*Id.*, 85.) She could think of no accommodations
at that time.[11] Therefore, Keith told her Daikin management would
meet and determine whether they could offer her an accommodation.
(*Id.*)

To assist in targeting plaintiff's work restrictions, Keith
again asked Dr. Manifold for more detailed information than had
been provided.[12] (Keith Affidavit, at ¶ 21.) On May 16, 1995, Dr.
Manifold supplied a "Physician's Report" specifying the following
limitations: no prolonged standing\walking, kneeling, squatting, or
stooping; her job must consist primarily of sitting; lifting
limited to 10 pounds; bending and twisting limited to a maximum of
10-20 degrees; and no repetitive operation of "foot controls."
(Plaintiff's Supplemental Evidentiary Submission: Exhibit 27.)

---

[11]Plaintiff testified she offered no suggestions for accommodations during
that conversation, because she was stressed from the earlier conversation with
James Conheady and she was not thinking well. (Plaintiff's Deposition, at 85.)
Since then, however, plaintiff suggested job-sharing as an accommodation. (*Id.*)

[12]On May 12, 1995, plaintiff authorized Daikin to contact Dr. Manifold
directly in order to obtain such a report.

12

Forrest Keith, James Conheady, and Gerald Murray evaluated the
foregoing restrictions, together with a description of the duties
of a P1 Finishing Operator,[13] and concluded that "no reasonable
accommodation would enable Ms. Lorance to perform that job."
(Keith Affidavit, at ¶ 23.) Forrest Keith testified that

> [he] also checked to see whether there were any jobs
> available at Daikin that Ms. Lorance was qualified to
> perform.   There were no clerical jobs available....
> Additionally, even if a clerical job had been available,
> Ms. Lorance would not have been qualified for such a job
> because she had not completed Daikin's clerical pre-
> employment training that is a prerequisite to obtaining
> a regular clerical job at Daikin.

(*Id.*, ¶ 24, 25.)

On May 24, 1995, Forrest Keith telephoned plaintiff and
informed her that Daikin was unable to accommodate her, and that
her employment would be terminated. In a memorandum for record, he
wrote:

> We have discussed your situation here among us, including
> top management.  We looked at how we could reasonably
> accommodate your restricted condition to enable you to do
> the P-1 Finishing job and have concluded we cannot make
> it possible in light of your physical restrictions.  We
> also considered whether there was another job you could

---

[13]Daikin's P1 Finishing Operator job description lists the essential duties
and responsibilities for that position as follows: clean and inspect drums and
bags used for the packaging of molding powders; understand and operate all
process steps controlled and monitored by the DCS; performs scheduled
maintenance, inspection and cleaning of all process equipment; may generate or
handle hazardous waste; troubleshoot equipment and process problems and correct
when possible; read and comprehend process instrumentation diagrams; enter
process data onto log sheets and in the computer database; perform quality
control tests such as apparent density, speed calculations, etc.; maintain
cleanliness standards in cleanrooms and all areas of the Finishing building;
assist in the development and writing of equipment and process operating
procedures; maintain safety, quality and production standards by monitoring key
process variables and process indicators; notify supervisor, shift supervisor,
and/or team leader of major problems; actively participate and contribute to team
and shift change meetings; and, other duties as assigned.

13

> do here.  There is no other job available that you can
> do.  We are terminating your employment effective today,
> May 24, 1995.  You will be sent your accrued vacation pay
> and notice of COBRA rights by first class mail within the
> next few days.

(Movant's Evidence Submitted in Response to Exhibit C of the

Court's Order: Exhibit 13.)

## A.   Plaintiff's Long Term Disability Benefits.

On March 31, 1995, plaintiff applied for long term disability

benefits ("LTD").  Her application was submitted to Mutual of Omaha

Insurance Company, the LTD Plan's Claims Administrator.[14]  (Keith

Affidavit, at ¶ 17.)  The application initially was denied, but

subsequently approved.[15]   Plaintiff was paid all benefits

retroactive to the application date, through May 15, 1995, the date

on which Dr. Manifold released her to return to work. (Plaintiff's

Deposition, at 112-13.)

## B.   Plaintiff's Post-Daikin Employment

Following her discharge, plaintiff applied for unemployment

compensation benefits. (Id., 107-08.)  That application also was

denied initially by the State of Alabama Department of Industrial

Relations, but plaintiff appealed and a hearing was held on July

14, 1995, in Decatur, Alabama.  Plaintiff's claim for unemployment

compensation benefits ultimately was approved.

---

[14]The decision on whether or not plaintiff would be approved for LTD
benefits was up to Mutual of Omaha Insurance Company, Inc., not Daikin.  (Keith
Affidavit, at ¶ 17.)

[15]Plaintiff testified she did not recall the precise date on which her
application was approved; however, she states it was "approximately" in November
of 1995.  (Plaintiff's Deposition, at 111-112.)

14

In September 1995, plaintiff obtained employment as a Logistics Manager for "Decision One," a computer maintenance service company. As a Logistics Manager, plaintiff is responsible for

> eighteen engineers in the Huntsville area, getting their parts in. They go out into the field and repair different systems, and I am responsible for making sure they get their parts in on time. Sometimes that may be a two — to three — hour response, that can include finding the vender to purchase it from to intercompany transfers, take the actions that are necessary to make sure they have their parts here on time. I deal with purchasing. I do all of the purchasing for our local office.

(*Id.*, 8-9.) Plaintiff also is responsible for billing. (*Id.*, 9.) She works "an average of between fifty to fifty-five hours a week" and earns $10.65 per hour. (*Id.*, 10.)

## II. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment not only is proper, but "<u>shall be rendered forthwith if</u> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis supplied.) The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64

15

F.3d 590, 593 (11th Cir. 1995). **Rule 56 permits the movant to discharge this burden with or without supporting affidavits.** *Celotex,* 477 U.S. at 325. **When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.** *Jeffery,* 64 F.3d at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman,* 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston,* 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates,* 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *Augusta Iron & Steel Works v. Employers Ins. of Wausau,* 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for

16

the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### III. ADA CLAIM

Congress enacted the ADA in 1990 for the stated purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title I of the Act, which applies to private sector employers, provides that:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

*Id.* § 12112(a). The Act further imposes an affirmative duty upon employers to provide reasonable accommodations for disabled individuals. In ADA parlance, the word "discriminate" is defined broadly to include

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an ... employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business. *Id.* § 12112(b)(5)(A).

### A. Burden Shifting Analysis

Plaintiff bears the burden of proving by a preponderance of the evidence that Daikin intentionally discriminated against her, because of her disability. That can be done either by direct or

17

circumstantial evidence.   When plaintiff's evidence is circum-
stantial in nature, however, the Supreme Court has developed a
three stage framework for focusing the inquiry. *See McDonnell
Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668
(1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S.
248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981); *St.
Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125
L.Ed.2d 407 (1993).[16]

First, plaintiff must establish a *prima facie* case, which,
under the ADA, requires proof that: (1) plaintiff is an individual
with a "disability";[17] (2) she is a "qualified" individual (*i.e.*,
that she can, with or without reasonable accommodation, perform the
essential functions of the employment position she holds or seeks);
and (3) she was subjected to discrimination because of her
disability. *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907,
910 (11th Cir. 1996)(citing *Pritchard v. Southern Company Services*,
92 F.3d 1130, 1132 (11th Cir. 1996), and *Morisky v. Broward County*,

---

[16]Although the Eleventh Circuit has not explicitly held so, it is widely
agreed that the burden-shifting analysis expressed in McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and applied in Title
VII cases is similarly followed in deciding cases brought under the ADA. *See*
Moses v. American Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir. 1996), *cert.
denied*, __ U.S. __, 117 S.Ct. 964 (1997)(implicitly using burden-shifting
framework); McNemar v. The Disney Store, Inc., 91 F.3d 610, 619 (3d Cir. 1996),
*cert. denied*, __ U.S. __, 117 S.Ct. 958 (1997); Rizzo v. Children's World
Learning Centers, Inc., 84 F.3d 758, 761 n.2 (5th Cir. 1996), *cert. denied*, __
U.S. __, 117 S.Ct. 958 (1997); *see also* Johnson v. Boardman Petroleum, Inc. 923
F. Supp. 1563 (S.D. Ga. 1996); Lewis v. Zilog, Inc., 908 F. Supp. 931 (N.D. Ga.
1995).

[17]The determination of whether an individual has a disability is not
necessarily based on the name or diagnosis of the impairment, but rather on the
effect of that impairment on the life of the individual.   29 C.F.R. §
1630.2(j)(App.).

18

80 F.3d 445, 447 (11th Cir. 1996)). "In addition, a plaintiff must demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled." *Gordon*, 100 F.3d at 910.

If plaintiff establishes a *prima facie* case, then at the second stage of analysis the burden of production shifts to defendants to rebut the presumption of intentional discrimination by articulating legitimate, nondiscriminatory reasons for the contested employment action. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. If defendants do so, then in the final step of the inquiry plaintiff must have an opportunity to show by a preponderance of the evidence that defendant's stated reasons merely are pretexts for unlawful, discriminatory motives. *Id.*

## B. Plaintiff's Prima Facie Case

Under the ADA, "disability is defined as: (a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (emphasis supplied).

> While the ADA defines neither "major life activities" nor "substantially limits," courts may rely upon the regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") for guidance. *See* 42 U.S.C. § 12116 (requiring the EEOC to issue regulations to implement Title I of the ADA); *Dutcher*, 53 F.3d at 726. The ADA regulations adopt the definition of "major life activities" found in the Rehabilitation Act regulations. *See* 34 C.F.R. § 104. This term is defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). In this regard, the EEOC has provided that courts should consider the following three factors when

19

> determining whether an impairment substantially limits a
> major life activity: (1) the nature and severity of the
> impairment; (2) the duration or expected duration of the
> impairment; and (3) the permanent or long term impact, or
> the expected permanent or long term impact of or
> resulting from the impairment. 29 C.F.R. § 1630.2(j)(2);
> *Dutcher*, 53 F.3d at 726; *Bolton v. Scrivner, Inc.*, 36
> F.3d 939 (10th Cir. 1994), *cert. denied*, __ U.S. __, 115
> S.Ct. 1104, 130 L.Ed.2d 1071 (1995).

*Gordon*, 100 F.3d at 911 (emphasis supplied).

Plaintiff alleges her pelvic relaxation syndrome constitutes

a disability, and she has submitted evidence indicating that

condition limited her ability to perform manual tasks required of

a P-1 Finishing Operator and, therefore, her ability to work.   To

demonstrate that an impairment substantially limits the major life

activity of working, an individual must show;

> significant[] restrict[ions] in the ability to perform
> either a class of jobs or a broad range of jobs in
> various classes as compared to the average person having
> comparable training, skills, and abilities.   The
> inability to perform a single, particular job does not
> constitute a substantial limitation in the major life
> activity of working.

29 C.F.R.   § 1630.2(j)(3)(i); *see also Daley*, 892 F.2d at 215 (a

"major life activity" cannot be interpreted to include working at

the specific job of one's choice).

Thus, under the ADA the particular impairment must constitute

a significant barrier to employment in general.   *DePaoli v. Abbott*

*Laboratories*, 1996 WL 197685 (N.D. Ill. 1996)(citing *Byrne v. Board*

*of Education, School of West Allis,* 979 F.2d 560, 565 (7th Cir.

1992) and *Daley*, 892 F.2d at 215).

20

The following three factors are relevant to determining whether an impairment "substantially limits" an individual's employment potential:

> (A) The geographical area to which the individual has reasonable access;
>
> (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
>
> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii)(A)-(B); see also I Lindemann and Grossman, *Employment Discrimination Law* 279 (3d ed. 1996). In other words, a plaintiff must provide some "evidence of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs ('few,' 'many,' 'most') from which an individual would be excluded because of an impairment." *Ouzts v. USAir, Inc.*, 1996 WL 578514, *13 (W.D. Pa. July 26, 1996)(citing 29 C.F.R. § 1630.2(j)). A plaintiff must make this minimum showing to sustain her summary judgment burden. *Ouzts*, 1996 WL 578514, *13 (citing *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 944 (10th Cir. 1994); *Nicandro v. Berkeley Farms, Inc.*, 1994 WL 705267 (N.D. Cal. 1994)).

Plaintiff argues "[she] has serious limitations which restrict her freedom to perform any activity that involves physical exertion

21

and bending, stooping, stretching, and lifting more than 10 pounds." (Plaintiff's Brief, at 19.) Specifically, Dr. Manifold instructed plaintiff to "seek a modification of her work activities" by "avoid[ing] 'strenuous activities' that would increase the pressure in her pelvic region," and avoid any "heavy lifting and straining." (Movant's Evidence Submitted in Response to Exhibit C of the Court's Order: Exhibit 11.) On May 10, 1995, Dr. Manifold informed Daikin of those limitations, and stated that plaintiff could "function very well in a more sedentary job environment." (*Id.*)

In addition, pursuant to Forrest Keith's request, Dr. Manifold later supplied Daikin with a "Physician's Report" placing the following limitations on plaintiff's ability to work: no prolonged standing\walking, kneeling, squatting, or stooping; her job must consist primarily of sitting; lifting limited to 10 pounds; bending and twisting limited to a maximum of 10-20 degrees; and, no repetitive operation of "foot controls." (Plaintiff's Supplemental Evidentiary Submission: Exhibit 27.)

Even so, a review of relevant case law reveals that plaintiff's restrictions do not establish a substantial limitation of a major life activity. *See Horth v. General Dynamics Land Systems, Inc.*, 1997 WL 145052 (M.D. Pa. March 26, 1997)(inability to sit or stand for more than two hours at a time, difficulty walking, and difficulty lifting objects over twenty pounds insufficient to establish disability); *Williams v. Channell Master Satellite Systems Inc.*, 101 F.3d 346, 349 (4th Cir. 1996), *cert.*

22

*denied* , __ S.Ct. __, 1997 WL 155426 (May 27, 1997)(25 pound lifting restriction was, as a matter of law, insufficient to establish a significant limitation of the major life activity of working); *Ray v. Glidden Co.*, 85 F.3d 227 (5th Cir. 1996)(inability to lift 10 to 56 pound containers insufficient, as a matter of law, to establish a significant limitation of the major life activity of working); *Dutcher*, 53 F.3d at 726-27 (inability to do heavy lifting and repetitive motions insufficient, as a matter of law, to support a finding of disability); *Bolton*, 36 F.3d at 943-44 (inability to lift heavy weights or stand for long periods of time insufficient, as a matter of law, to establish a disability).

Even if the foregoing restrictions constitute a significant limitation, that evidence alone is insufficient to demonstrate that plaintiff's condition substantially restricted her ability to perform either a class of jobs, or a broad range of jobs in various classes, as compared to the average person having comparable training, skills, and abilities.  There simply is no evidence on those matters listed in 29 C.F.R. § 1630.2(j)(3)(ii)(A)-(B).

An instructive case is *Bolton v. Scrivner, Inc.*, 36 F.3d 939 (10th Cir. 1994), where plaintiff's employer refused to rehire him following a medical leave of absence because plaintiff's doctor concluded he would not be able to perform his old job.  Despite evidence that plaintiff was limited in standing, walking, and lifting objects, the court held he was not restricted in performing a broad range of jobs:

> This evidence, however, does little to show that
> [plaintiff] is restricted from performing a class of

23

> jobs. The evidence does not address [plaintiff's]
> vocational training, the geographical area to which he
> has access, or the number and type of jobs demanding
> similar training from which [plaintiff] would also be
> disqualified. Instead, the evidence goes to the nature
> and severity, duration, and impact of [plaintiff's]
> impairment — the factors listed in 29 C.F.R. §
> 1630.2(j)(2). Because [plaintiff] failed to produce
> evidence showing a significant restriction in his
> "ability to perform either a class of jobs or a broad
> range of jobs in various classes," *id*. § 1630.2(j)(3)(i),
> we affirm the award of summary judgment to [defendant] on
> [plaintiff's] ADA claim.

*Bolton,* 36 F.3d at 944 (footnotes omitted).

Similarly, the only evidence submitted by plaintiff involves the nature, severity, duration, and impact of her impairment as determined by Dr. Manifold. Plaintiff has failed to come forward with specific facts showing that her physical impairment is a significant barrier to employment generally. In particular, plaintiff has offered no evidence of the number and type of jobs from which she is disqualified as a result of her condition, or the geographic area to which she has access. The record, in fact, indicates plaintiff had little difficulty in attaining a position in her geographic area despite her limitations. In that regard, plaintiff concedes that, following her termination, she obtained employment as a Logistics Manager for a computer maintenance service company, and worked between fifty and fifty-five hours a week.[18] Accordingly, even though plaintiff's limitations may preclude her from performing the duties of a P-1 Finishing Operator, she has presented no evidence demonstrating that such limitations foreclose her participation in an entire class of jobs,

---

[18]*See supra* at 14-15.

24

or a broad range of jobs in various classes. Thus, plaintiff has failed to establish her *prima facie* case under the ADA, and summary judgment is due to be granted as to that claim.

## IV. PREGNANCY DISCRIMINATION UNDER TITLE VII

Plaintiff also alleges she was terminated in violation of the Pregnancy Discrimination Act of 1978 ("PDA"). Title VII provides that it is an unlawful employment practice for an employer to discharge an individual because of her sex. *See* 42 U.S.C. § 2000e-2(a)(1). After the Supreme Court held that differentiation of pregnancy benefits from other benefits did not violate Title VII, because it was not gender-related but, instead, was condition-related (*General Electric Co. v. Gilbert*, 429 U.S. 125, 145-46, 97 S.Ct. 401, 412, 50 L.Ed.2d 343 (1976)), Congress expanded Title VII by enacting the PDA which provides:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes; including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work.

42 U.S.C. § 2000e(k).

The analysis required to prove discrimination on the basis of pregnancy mirrors that of Title VII sex discrimination claims. *Maddox v. Grandview Care Center, Inc.*, 780 F.2d 987, 989 (11th Cir. 1986). To establish a *prima facie* case of disparate treatment under the PDA, a plaintiff must show that: (1) she is a member of a group protected by the statute; (2) she was qualified for the

25

position; (3) she suffered an adverse effect on her employment; and (4) she suffered from differential application of work rules. *Armstrong v. Flowers Hospital, Inc.*, 33 F.3d 1308, 1314 (11th Cir. 1994). The fourth element is critical to plaintiff's claim. "Title VII requires employers to treat employees who are members of protected classes the same as other similarly situated employees, but it does not create substantive rights to preferential treatment." *Lang v. Star Herald*, 107 F.3d 1308 (8th Cir. 1996)(citing 42 U.S.C. § 2000e-2(j)); *see also Byrd v. Lakeshore Hospital*, 30 F.3d 1380 (11th Cir. 1994)("It is today a settled principle that the PDA and Title VII are violated when pregnant employees are denied privileges afforded non-pregnant temporarily disabled employees"). Thus, plaintiff must set forth evidence that she was treated differently than similarly situated employees outside her protected class.

Plaintiff does not establish her *prima facie* case. It is uncontested that plaintiff cannot perform the essential duties of a P-1 Finishing Operator position. (Brief in Opposition to Defendants' Motion for Summary Judgment, at 4.) The physical limitations placed on plaintiff by Dr. Manifold render her unqualified for that position, without accommodations being made.[19] Despite plaintiff's lack of qualification for that position, she states that "[t]he evidence demonstrates that it is within Daikin's usual course of business to have flexibility in the various jobs at the plant." (Brief in Opposition to Defendants' Motion for Summary

---

[19]*See supra* discussion at 9-11.

26

Judgment, at 12.)  As evidence of Daikin's "flexibility," plaintiff contends that Jackie Love, a P-1 Finishing Operator, "was not exposed to strenuous physical activity on a daily basis in her position." (Id., at 13.)  In addition, plaintiff notes that Daikin had a routine of hiring temporary employees that were not expected to perform all of the duties of a P-1 Finishing Operator.  (Id.)

Even so, unlike the ADA, the PDA does not require employers to make accommodations for pregnant workers.  See Armstrong v. Flowers Hospital, Inc., 33 F.3d 1308, 1317 (11th Cir. 1994)(it is "clear that the PDA does not require employers to extend any benefit to pregnant women that they do not already provide to other disabled employees"); see also Lang, 107 F.3d at 1311 (citing Geier v. Medtronic, Inc. 99 F.3d 238, 242 (7th Cir. 1996)(no requirement under PDA that employers accommodate their pregnant workers)); Sussman v. Salem, Saxon & Nielsen, P.A., 153 F.R.D. 689, 693 (M.D. Fla. 1994)("To require an employer to make reasonable accommodations for a pregnant employee is to require the employer to relinquish virtually all control over employees once they do become pregnant").  Thus, Daikin is under no obligation to restructure plaintiff's P-1 Finishing Operator responsibilities to meet her limitations or to move her to a temporary position in order to comply with the PDA.  Accordingly, plaintiff is not "qualified" for the position she seeks.

In addition, plaintiff failed to establish the critical element of differential application of work rules.  No evidence in that regard was presented.  Therefore, plaintiff failed to

27

establish her *prima facie* case under the PDA and summary judgment
is due to be granted as to that claim.

### V. STATE LAW CLAIM

Plaintiff alleges a claim of intentional infliction of
emotional distress, also known as "the tort of outrage," against
Daikin and Forrest Keith.  *See Evans v. Waddell*, 689 So.2d 23, 30
(Ala. 1997)("In Alabama, the actionable intentional infliction of
emotional distress is termed the 'tort of outrage'"); *Lumbermen's
Underwriting Alliance v. Lumbermen's Underwriting Alliance*, 662
So.2d 1133 (Ala. 1995)("intentional infliction of emotional
distress [is] otherwise known as the tort of outrage"); *Jackson v.
Colonial Banking Company*, 507 So. 2d 1310, 1311 (Ala. 1987)(the
tort of outrage is also known as the tort of intentional infliction
of emotional distress).    The Alabama Supreme Court recently
described the burden of proof a plaintiff must carry in order to
recover for the tort of intentional infliction of emotional
distress as follows:

> This court first recognized the tort of outrage, or
> intentional infliction of emotional distress, in *American
> Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981).
> In *Inmon*, the Court held that to present a jury question
> the plaintiff must present sufficient evidence that the
> defendant's conduct (1) was intentional or reckless; (2)
> was extreme and outrageous; and (3) caused emotional
> distress so severe that no reasonable person could be
> expected to endure it.    The court defined the second
> element of the tort of outrage as follows: "By extreme we
> refer to conduct so outrageous in character and so
> extreme in degree as to go beyond all possible bounds of
> decency, and to be regarded as atrocious and utterly
> intolerable in a civilized society."

*Richardson v. Mutual Savings Life Insurance Company*, 1997 WL
170271, *2 (Ala. April 11, 1997)  Plaintiff alleges nothing that

28

remotely approaches that level.  Accordingly, summary judgment is due to be granted as to that claim.

### VI.  CONCLUSION

An order consistent with this memorandum opinion shall enter contemporaneously herewith.

DONE this _18th_ day of June, 1997.

United States District Judge

29